UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| KAREN A. ARNETT, et al., | : | Case No. C-1-02-87 |
| | : | |
| Plaintiffs, | : | (Judge S. Arthur Spiegel) |
| | : | |
| vs. | : | **DEFENDANT'S MEMORANDUM** |
| | : | **IN RESPONSE TO PLAINTIFFS'** |
| WILLARD INDUSTRIES, INC., | : | **MOTION TO ENFORCE** |
| | : | **COMPLIANCE WITH THE** |
| Defendant. | : | **CONSENT DECREE** |

Defendant Willard Industries, Inc. ("Willard") opposes Plaintiffs' Motion To Enforce Compliance With The Consent Decree ("Motion To Enforce"). Willard believes that it has substantially complied with the Consent Decree and that it should not be required to purchase and install an extremely expensive thermal oxidizer system, when Willard is already substantially complying with the emissions control requirements set forth in the Consent Decree.

## MEMORANDUM IN SUPPORT

### 1. Factual Background

The Consent Decree provides for a sequence of events to occur concerning the design, installation, testing and operation of an emissions control system, which includes certain monitoring devices. These events are as follows:

1.  Willard was to provide detailed design drawings of an emissions control system (the "Control System") (Consent Decree, Section 12). These drawings were produced to Plaintiffs.

2.  The drawings were to also include a depiction of certain monitoring devices, which were to measure the air flow in the bucket elevator shaft ("Monitoring Devices"). Willard was to

obtain costs of these monitoring devices and the parties were to attempt to reach agreement on the appropriateness of these Monitoring Devices (Consent Decree, Section 13). This occurred.

3. Willard and Plaintiffs were next to determine whether they agreed on the design and configuration of the Control System (Consent Decree, Section 15). The parties did agree on this.

4. Subsequent to agreement on the design and configuration of the Control System, additional emissions testing was to be performed by outside professionals to confirm that at least 40% of the total emissions and at least 40% specifically of benzene and styrene admissions would be exhausted through the Control System into the furnace where they would be consumed (Consent Decree, Section 16). The parties were to agree on the methodology for this testing and Plaintiffs' environmental consultant was to monitor the actual testing (Consent Decree, Section 17.) This testing occurred and did confirm that both 40% of the total emissions and 40% specifically of benzene and styrene emissions were exhausted to the furnace.

5. Upon completion of the above events, and in accordance with Section 6 of the Settlement Agreement incorporated into and made part of the Consent Decree, Willard paid Plaintiffs' legal fees, expert consulting fees, and other costs and expenses in the amount of $70,000.00.

6. Following this successful testing, Willard purchased and installed the Control System and Plaintiffs' environmental consultant, in accordance with the terms of the Consent Decree, inspected the Control System as installed to determine that it substantially conformed to the drawings and appeared to be properly installed (Consent Decree, Section 19). This occurred.

7. After the Control System was approved as installed, Willard then obtained a final test to determine whether the Control System captured at least 40% of total emissions. Willard's

environmental consultant was available to monitor this testing. The final testing involved two separate test runs. The testing company determined on the first test run that the Control System was capturing 33% of total emissions. On the second test run, the testing company determined that the Control System was capturing 40% of total emissions. The average percentage of total emissions captured on these two test runs was 37%. Section 21 of the Consent Decree provides as follows:

> "If the results of the Final Test show that the Control System, when Willard's Furnace is in full operation, is controlling at least 40% of total emissions from the loss foam process operating at maximum capacity, or such lesser percentage as may be agreeable to Plaintiffs, then the Control System shall be deemed to be properly installed and operating at the time of the Final Test, subject to further monitoring as set forth herein. If the results of the Final Test show either that the Control System, when Willard's Furnace is in full operation, is not controlling at least 40% of total emissions from the lost foam process operating at maximum capacity, or such lesser percentage as may be agreeable to Plaintiffs, then the parties shall submit this matter to the Court to determine, equitably and in the Court's sole and absolute discretion, whether Willard's performance of the items set forth in the Agreement and this Decree is sufficient to relieve Willard of any further performance, or otherwise determine what additional performance, if any, may be required to achieve a cost efficient manner of controlling 40% of total emissions from the lost foam process operating at maximum capacity."

8.     Subsequent to this testing, and in accordance with Section 30 of the Consent Decree, because the first test run showed only 33% of total emissions being captured, although the second test run showed 40% of total emissions being captured, Willard nonetheless agreed to:

> ". . . obtain a site-specific proposal and quote from a reputable vendor (such as Durr Environmental) for the purchase and installation of either a custom designed or off-the-shelf thermal oxidizer system with the ability to destroy volatile organic compounds and hazardous air pollutants emitted from the lost foam process."

Willard obtained a quote from B.W. Rogers Co. for various Durr RL style RTO's as follows:

|       |            |                                                              |
|-------|------------|--------------------------------------------------------------|
| RL-20 | 20,000 scfm | $440,000 approximate price, plus installation and freight |
| RL-20 | 25,000 scfm | $465,000 approximate price, plus installation and freight |
| RL-20 | 30,000 scfm | $575,000 approximate price, plus installation and freight |

A full detailed written proposal is forthcoming.

## 2. <u>Argument</u>

The Control System is completely operational and Willard is using it on a continuous basis. It is capturing a percentage of total emissions which Willard believes to be in the range of 40%. This belief is supported by the final testing, which showed in the second test run that the Control System was capturing 40% of total emissions.

In addition, the Monitoring Devices, which test for air flow, are also being utilized, and reports are now capable of being generated in the future.

The cost to Willard of complying with the Consent Decree, in addition to the $70,000.00 in Plaintiffs' legal fees it paid, was another approximately $50,000.00. This is in addition to the legal fees Willard has paid its own counsel.

Willard is a small privately-owned business that continues to struggle financially to make ends meet. It lacks sufficient cash flow to purchase the raw materials it needs to fill its orders. It is unable to obtain bank financing, and has been kept alive by the owner loaning additional funds to the company. Willard cannot afford to spend $450,000.00 - $600,000.00 on a thermal oxidizer system. Requiring it to do so will absolutely put it out-of-business.

Willard submits that it should not be required to do anything further. It has substantially complied with the terms of the Consent Decree and now has a Control System, which it is using and which is working. In fact, the second test run showed that it is capturing 40% of total emissions, which complies with the terms of the Consent Decree. The fact that the average of the two test runs shows it is capturing 37% of total emissions, rather than 40% is insignificant, and

certainly does not justify putting Willard out-of-business by requiring it to do something which it financially cannot do.

For these reasons, Willard requests that the Motion To Enforce be overruled.

Respectfully submitted,

/s/Charles M. Meyer
Charles M. Meyer (0019331)
Santen & Hughes
600 Vine Street, Suite 2700
Cincinnati, OH  45202
(513) 852-5986
(513) 721-7377 (fax)
cmm@santen-hughes.com
Trial Attorney for Defendant

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing Defendant's Memorandum In Response To Plaintiffs' Motion To Enforce Compliance With The Consent Decree was served by electronic mail this 19th day of January, 2007 upon the following:

D. David Altman, Esq.
D. David Altman Co., L.P.A.
15 E. 8th Street, Suite 200W
Cincinnati, OH  45202

/s/Charles M. Meyer

309545.1